# UNITED STATES DISTRICT COURT
## MIDDLE DISTRICT OF PENNSYLVANIA

ESTATE OF ERIC JACOBSEN, by
and through LINDA JACOBSEN,
Executrix,

      Plaintiff,

      v.

EAST STROUDSBURG AREA
SCHOOL DISTRICT and ROBERT
DILLIPLANE,

      Defendants.

CIVIL ACTION NO. 3:16-cv-01455

(SAPORITO, M.J.)

## MEMORANDUM

This is a federal civil rights action, brought by the plaintiff, the Estate of Eric Jacobsen, by and through Linda Jacobsen, Executrix. On July 14, 2016, the Estate filed its original complaint in this matter. (Doc. 1). On October 12, 2016, the Estate filed its amended complaint, asserting claims of discrimination and retaliation in violation of the Americans with Disabilities Act of 1990 (the "ADA"), 42 U.S.C. § 12101 *et seq.*, against his former employer, East Stroudsburg Area School District (the "District"), and Robert Dilliplane, principal of the school where Jacobsen had been employed as an eighth-grade math teacher. (Doc. 11). The amended complaint also asserts parallel state-law claims

under the Pennsylvania Human Rights Act (the "PHRA"), 43 Pa. Cons. Stat. Ann. § 951 *et seq*. The defendants filed their answer to the amended complaint on October 31, 2016. (Doc. 13).

The defendants have moved for summary judgment pursuant to Rule 56 of the Federal Rules of Civil Procedure. (Doc. 22). The defendants' motion is fully briefed and ripe for decision. (Doc. 23; Doc. 26; Doc. 27).

## I.  BACKGROUND

The decedent, Eric Jacobsen, committed suicide on January 15, 2015. For approximately fourteen years prior to his death, he had been a math teacher at Lehman Intermediate School. In the years leading up to his death, he had suffered from lower back, hip, and knee issues that had required multiple surgeries, causing him to miss substantial time at work, and which caused him pain and limited his mobility. He had also received several negative personnel evaluations over the years, for a variety of performance deficiencies. In the year leading up to his death, his deficient performance and the administrative response to it had progressed to the point that he had been suspended from work without pay on three separate occasions. At the time of his death, he

was on his third consecutive performance improvement plan. Days before his death, he had been informed that he was to be suspended for five non-consecutive days without pay.

The evidence adduced by the parties on summary judgment is largely documentary. Excerpts from transcripts of deposition testimony by Linda Jacobsen, the decedent's wife and executrix of his estate, and by defendant Dilliplane have been submitted, but they offer little in the way of substantive testimony based on personal knowledge of the facts underlying the plaintiff's claims. Linda testified that Jacobsen's disability "was physical in nature. He had difficulty standing for long periods, sitting for long periods, walking, navigating stairs." She also testified that he had difficulty lifting, twisting, turning, and sleeping, as a result of "a great amount of pain." She testified that Jacobsen had suffered from degenerative disc disease in his back, which caused problems in his hip, and he had no cartilage left in his knee.

The earliest evidence of disciplinary issues in the record before us is a copy of an October 8, 2007, performance improvement plan for the 2007–2008 school year. The primary deficiency addressed by this plan was Jacobsen's failure to maintain formal lesson plans. On October 22,

2007, he was issued a letter of reprimand for unprofessional and insubordinate conduct during a math department meeting.

On June 9, 2009, Jacobsen was placed on another performance improvement plan for the upcoming 2009–2010 school year. Although he had been keeping sporadic lesson plans, there were multiple weeks for which lesson plans were missing, and those produced for review by an assistant principal were apparently illegible. On July 30, 2009, Jacobsen received a formal teacher evaluation finding his performance for the year unsatisfactory overall, based on unsatisfactory performance in the categories of planning/preparation and professionalism. On October 16, 2009, Jacobsen received an amended performance improvement plan for the 2009–2010 school year.

The earliest evidence of potential disability in the record before us is a copy of correspondence dated April 18, 2012, advising Jacobsen that his request for unpaid Family Medical Leave Act ("FMLA") leave from January 23, 2012, through April 2, 2012, had been approved by the District school board. The reason for this extended period of medical leave is not specified in the evidence before us, but it appears to have been for back surgery.

On April 15, 2013, Jacobsen received a formal teacher evaluation finding his performance for the year satisfactory overall, but with unsatisfactory performance in the category of professionalism. On May 1, 2013, Jacobsen was placed on a performance improvement plan for the upcoming 2013–2014 school year—his third performance improvement plan—once again for failure to maintain satisfactory lesson plans. Also, according to the defendants' interrogatory responses, a number of incidents reports were filed during the year by students and other staff concerning inappropriate or unprofessional conduct in Jacobsen's classroom, and as a result, defendant Jacobsen was reassigned from a classroom on the third floor to one on the second floor, closer to the school's main office and near a guidance counselor's office so more people would be present to observe any future inappropriate conduct.[1] Jacobsen was also assigned to a new "team." It is not entirely clear from the record before us, but it appears that the classroom change was made over the summer between school years, and that Jacobsen himself packed the materials in his third-floor classroom

---

[1] We note that the interrogatory response itself indicates that documents were produced, but the interrogatory response is the only evidence proffered on summary judgment with respect to these facts.

for the move to a second-floor classroom.

On or before May 30, 2013, Jacobsen's back pain appears to have worsened. In a May 30, 2013, email to Dilliplane, he stated that "[a]ll of this disability stuff has happened so fast," and advised that he would be absent ten out of the eleven days remaining in the school year due to his back issue. Jacobsen advised that he had discussed it with personnel and would return to work for one day before the end of the school year so he could avoid using short-term disability or unpaid FMLA leave. He suggested that he would be back for "at least the first day of school next year," but he and his treating physicians were "looking to a different pain relief option." On June 4, 2013, Dilliplane emailed Patricia Farmer, a member of the District's human resources department, to inquire whether they had heard from Jacobsen or his doctor. Farmer responded by email, advising Dilliplane that Jacobsen had just applied for a vacant position as an in-school suspension ("ISS") teacher at East Stroudsburg High School South. Farmer speculated over email that Jacobsen would wait until after the ISS position was filled before submitting his leave paperwork. She noted that a second ISS position at East Stroudsburg High School North would be posted soon, and thus

the medical leave issue might drag out for a while. She also opined that Jacobsen wouldn't get either position. On June 5, 2013, Dilliplane emailed Jacobsen to advise him that he would need to submit a doctor's note excusing him for the days he would miss over the remainder of the 2012–2013 school year. Dilliplane also informed Jacobsen that he had been advised about Jacobsen's letter of interest in the ISS position, and he requested that Jacobsen let him know his intentions for next school year soon so appropriate staffing plans could be made before the availability of quality long-term substitute teachers diminished as people accepted jobs for the fall.

On July 1, 2013, Jacobsen emailed Dilliplane to advise him that:

> I met with the surgeon's assistant, and the likel[i]hood is that the surgeon will fuse together the lower 4 lumbar bones and add plastic spacers to reduce the pain. This is a very involved operation, with a long recovery time. Way more than the las[]t one. In addition the fusing of my back results in a loss of mobility, since the back bones can[]not move as designed.

> Since the recovery is lengthy[,] I am hoping to get the ISS job at the south high school.

> Do you know if this job is still available? Also I would appreciate it if you would put in a good word for me.

(Doc. 26-6, at 7 ("ESASD 398")).

On July 3, 2013, Dilliplane responded by email, stating:

> Sounds like a serious operation. I hope everything works out for you.
>
> Please let me know what you plan on doing as soon as you are able to do so. If you are going to have the operation, I will need to get a long-term substitute and I would want someone decent. . . . As the summer moves along, though, someone else might need a substitution and I would not want to lose the good people who are still available.
>
> In terms of the ISS position at HSS, I am not sure what the status is with respect to that position. You could call Human Resources to get an update.

(*Id.*).

Sometime later in July, Jacobsen was approved for medical leave until October 23, 2013. In a July 26, 2013, conversation, Dilliplane was advised by District human resources staff that Jacobsen had made some remarks while visiting to fill out leave paperwork in which he expressed his displeasure at being moved to a new room and a new team.

On July 31, 2013, Jacobsen had surgery to perform a posterior spinal fusion at L4-S1.

On October 7, 2013, Dilliplane emailed Jacobsen to provide him with an update, presumably in preparation for his impending return to work. Dilliplane wrote:

I hope you are doing well and recovering nicely.

I wanted to update you on a few items of importance:

. . . .

. . . Kristina had set up your classroom at the beginning of the school year, but there were over 20 boxes/crates that did not fit in the classroom. Please note that the [new second-floor] classrooms are smaller than the other classrooms and cannot accommodate such an excess of materials. Your boxes/crates have been placed on a skid on the receiving dock for now. There is not enough room in the classroom for all of these materials, so they will need to be weeded out when you return and the extra materials will need to be taken home. My preference is to not line the counters, walls, and floors in the classroom with the boxes and crates.

. . . .

(*Id.*, at 11 ("ESASD 640").

On October 11, 2013, Jacobsen responded by email:

I am doing better.

I can tie my own shoes now!

Currently I am on a 10 lb weight restriction for lifting.

I am seeing the doctor on the 18th to see if I am going to return on the 24th[] and if I get [an] increase in my weight restriction for lifting.

Therefore I will need some help to move my materials.

Last year you caused me several days of intense pain packing up my room in such a short period of time.

I am not eager to move my stuff and rein[j]ure my back.

(*Id.*).

On October 13, 2013, Dilliplane replied by email:

I am very glad to hear that you are doing well.

Some important items:

1. I know you are unhappy about being moved to another team. Please understand I have a school to run and I need to make personnel decisions to maximize the product we offer for our students. . . . Part of the process of ensuring that our product is of the highest quality is to have our staff assigned to positions and/or teams that will help facilitate their maximum effectiveness, both individually and as a unit. Your assignment was only one of many that were changed last year. At no time was anyone required to physically move or lift anything by themselves, so I do not appreciate your remark about me causing you severe back pain. You were never obligated to move anything by yourself. Our wonderful custodial staff helped many people relocate their belongings and they would have been more than happy to help you relocate your belongings as well.

2. Keep in mind that you are one of the few teachers who have been lucky enough to receive three filing cabinets. That being said, you have accumulated too much stuff to be stored at school. You are welcome to take those items home. When you feel you are up to it, let me know and we'll make your items available for perusal. Those items, however, will not be moved back up to your classroom. There are simply too many materials to fit into your new classroom.

. . . .

> 4. You are on your 3rd Plan of Assistance, which will
> resume again upon your return. . . .

(*Id.*, at 10 ("ESASD 639")).

On October 18, 2013, Jacobsen met with his doctor, Christopher Wagener, M.D., for a post-surgical follow-up. In his treatment notes, Dr. Wagener indicated that Jacobsen was not able to work until his next evaluation, the date of which is not apparent from the record. He also indicated that Jacobsen was capable of lifting a maximum of 20 pounds, or 10 pounds frequently, he was capable of walking or standing, but no kneeling, bending, squatting, twisting, or turning.

Jacobsen apparently advised his employer that he would be returning to work on November 18, 2013. Early that morning, Jacobsen emailed Dilliplane to advise him that his doctor gave him an additional two weeks with no work, his next medical appointment was Friday, November 29, 2013, and he anticipated returning to work on Tuesday, December 3, 2013.[2] In an email to human resources, Dilliplane expressed his displeasure with the last-minute notice from Jacobsen,

---

[2] Monday, December 2, 2013, was "buck day"—a districtwide day off from school.

and his belief that Jacobsen waited until the last moment to intentionally inconvenience Dilliplane.

On November 29, 2013, Jacobsen met with Dr. Wagener for a follow-up exam. Dr. Wagener noted that Jacobsen presented with decreased back and leg pain following surgery, but continued complaints of left hip pain. Dr. Wagener noted that Jacobsen presented with a normal gait, no swelling, and no tenderness in his lower back, and full range of motion. Dr. Wagener found pain on internal rotation of the left hip. He referred Jacobsen to another doctor for evaluation and treatment of his left hip pain and possible osteoarthritis. He indicated in his treatment notes that Jacobsen was not able to work until January 5, 2014. He indicated a tentative return to work on January 6, 2014, with activity restrictions. He also indicated that Jacobsen was capable of lifting a maximum of 20 pounds, or 10 pounds frequently, he was capable of walking or standing, but no kneeling, bending, squatting, twisting, or turning.

Jacobsen sent an email to Dilliplane at 8:02 a.m. on December 3, 2013, stating:

> You may be expecting me back today. This will not be the case. I went to the doctor last Friday, he gave me a

good news/bad news kind of thing. First the good news, my back is healing nicely, and developing new bone around the parts he put in. The bad news is that I am having alot (*sic*) of pain in my left hip. He found that I need a new hip, no cartilage, arthritis, bone on bone, etc. I have an appointment on the 10th with an orthopedic surgeon[] [t]o see when the hip will be replaced[.] I'll let you know more when I know more.

(*Id.*, at 14 ("ESASD 250")). In his personal notes, Dilliplane expressed his belief that Jacobsen had deliberately attempted to inconvenience Dilliplane by waiting until the last moment to make it difficult to find a substitute teacher.

On December 16, 2013, Jacobsen had surgery for a left total hip replacement. He met with his hip surgeon, Daniel Terpstra, D.O., for a follow-up exam on December 26, 2013. Dr. Terpstra indicated in his treatment notes that Jacobsen was not able to work until his next evaluation in two weeks. On January 9, 2014, Dr. Terpstra examined Jacobsen and found him not able to work until his next evaluation in four weeks.

On February 6, 2014, Jacobsen met with Dr. Terpstra for a follow-up examination. In his treatment notes, Dr. Terpstra indicated that Jacobsen was "currently asymptomatic," and the patient had stated "that his left hip is doing great and he has no pain," that he "is very

happy with the outcome of the surgery," that "his back pain has gone away as well," and that "his [range of] motion is much better compared to prior to the surgery." Dr. Terpstra indicated in his treatment notes that Jacobsen was not able to work through February 9, 2014, but he was able to return to work, full duty, on February 10, 2014. Dr. Terpstra further instructed that Jacobsen should bear weight on his hip as tolerated and use crutches as needed for comfort and safety.

Jacobsen returned to work on February 10, 2014. On February 17, 2014, he was provided with and signed an updated copy of his third performance improvement plan, covering the remainder of the 2013–2014 school year.

On February 18, 2014, Jacobsen presented to Dr. Terpstra with complaints of right knee pain. Jacobsen reported that "a few weeks ago he was standing, twisted and felt a pop and pain in his right knee. Patient has been having swelling in the knee since the injury." Jacobsen further reported that he had been using a cane for assistance with walking. On examination, Dr. Terpstra found swelling, tenderness, and a limited range of motion. Dr. Terpstra referred Jacobsen for an MRI of his knee and found him capable of returning to unrestricted activity.

On February 25, 2014, Jacobsen met with Dr. Terpstra to discuss his MRI results. He reported a "4 out of 10 pain." On exam, Dr. Terpstra found swelling, tenderness, and a limited range of motion. The MRI found moderately severe arthritic changes, potential bone-on-bone contact, potential stress/insufficiency fracture or necrosis, multiple meniscus tears, and other damage to his knee. Dr. Terpstra aspirated the knee and injected a corticosteroid. Dr. Terpstra indicated in his treatment notes that Jacobsen was capable of returning to modified activity—"for knee as tolerated."

On March 5, 2014, Jacobsen received a formal letter of reprimand from Dilliplane admonishing him for a breach of standardized testing protocol on February 12, 2014. Jacobsen was advised that he had been placed on progressive discipline. On March 7, he received a letter from the District superintendent concerning this same infraction, advising Jacobsen that, in addition to being placed on progressive discipline, he would be suspended without pay for one day on March 10, 2014.

On March 11, 2014, Jacobsen presented to Dr. Terpstra for a follow-up examination of his knee. Jacobsen reported he was "not having nearly as much pain" as previously and that "walking is not as

painful anymore," therefore he didn't feel surgery necessary at the time. On exam, Dr. Terpstra found no tenderness, no effusion, full range of motion, and normal muscle strength and tone. He returned Jacobsen to unrestricted activity with instructions to "weight bear as tolerated."

On April 12, 2014, Jacobsen presented to Dr. Wagener for a follow-up evaluation with respect to his back surgery. Jacobsen reported his present pain as "0–1" on a 10-point scale, with his worst recurrent pain as a "5" on a 10-point scale. He reported that since his hip surgery, his pain had significantly decreased, and he was "[v]ery pleased with the progress of both surgeries." On exam, Dr. Wagener found normal alignment and lordosis, no tenderness, and full range of motion in Jacobsen's spine, and no tenderness, no swelling, and normal range of motion in both hips. Jacobsen was instructed to return in one year for his next follow-up exam.

On May 13, 2014, Jacobsen presented to Dr. Terpstra for a follow-up evaluation of his knee and hip. Jacobsen reported that his left hip was doing "great," but he was still having some pain in his right knee. He reported that "the knee is not terrible at this time and the last cortisone injection 10 weeks ago is still working," but "most of the knee

pain comes with increased activity." Jacobsen reported that his total hip replacement was doing "great" and he was not experiencing any complications. On examination of Jacobsen's left hip, Dr. Terpstra found no visible abnormalities, no tenderness, full range of motion except for some non-painful restricted movement on passive hip rotation, normal muscle strength and tone, and no joint laxity or joint dislocation. On examination of Jacobsen's right knee, Dr. Terpstra found no visible abnormalities, no tenderness, no effusion, full range of motion with some crepitus (cracking or popping) on motion, and normal muscle strength and tone. Dr. Terpstra returned Jacobsen to unrestricted activity, with instructions to "weight bear as tolerated."

On June 3, 2014, Jacobsen received a formal letter of reprimand from the District superintendent admonishing him for another breach of standardized testing protocol. The letter noted that he was currently on progressive discipline and advised that he would be suspended without pay for three nonconsecutive days on June 5, 10, and 12, 2014.

On June 17, 2014, Jacobsen received a teacher evaluation form indicating that he needed improvement in the category of organizing his physical space, and he was failing in the category of growing and

developing professionally. Elsewhere on the form, Jacobsen's strongest areas of performance were characterized as ones where he also needed improvement," suggesting a overall performance at the "needs improvement" level of performance.

On July 8, 2014, Jacobsen applied by email for a vacant position as an ISS teacher at East Stroudsburg High School North. In his application email, Jacobsen commented that he "would welcome the opportunity to work with Steve again." When a District human resources staffer shared Jacobsen's email application with Dilliplane, the Lehman principal responded by email, commenting:

> Yeah. . . I'll bet he would welcome the opportunity to work with Steve again. He would do anything to get away from me. . .
>
> Oh well. . . they can't all love me. After all, someone has to make the trains run on time. . . and that sometimes involves telling people things they don't necessarily want to hear. . .
>
> This caused me much time off task and slacking – I could not stop chuckling. . .
>
> :)

(Doc. 26-6, at 16 ("ESASD 441")).

On September 4, 2014, Jacobsen was placed on a performance improvement plan for the upcoming 2014–2015 school year—apparently

an extension of the same third performance improvement plan—based on the same deficiencies as his previous performance improvement plan, plus those noted in his most recent teacher evaluation.

On October 9, 2014, Jacobsen received his formal teacher evaluation for the 2013–2014 school year, finding his performance for the year satisfactory overall, notwithstanding a "needs improvement" performance rating. An unsigned draft evaluation submitted into evidence suggests that an "unsatisfactory" teacher performance evaluation, based on a performance rating of "failing," was considered as well.

On December 9, 2014, Jacobsen presented to Dr. Terpstra for a follow-up evaluation of his right knee. Jacobsen reported to Dr. Terpstra that his knee pain was "more achy." He attributed this to an incident about three weeks prior in which he had to break up a fight. On exam, Dr. Terpstra found swelling and moderate effusion of the right knee, but no tenderness. He observed that the patient's gait was antalgic and his right knee range of motion limited to 115 degrees. Dr. Terpstra treated the knee pain by aspiration and injection of a corticosteroid into the right knee joint.

On December 23, 2014, Jacobsen presented to Dr. Terpstra for a follow-up evaluation of his right knee, post-injection. Jacobsen reported pain at a "3" on a 10-point scale, and stated that his knee was "better" and the swelling all gone. He expressed that he did not wish to consider surgery at the time. On exam, Dr. Terpstra found no swelling, no tenderness, and no effusion of the right knee. Dr. Tepestra observed that the patient's gait was antalgic and his right knee range of motion limited to 115 degrees. Dr. Terpstra noted that Euflexxa injections were a future option based on good results, and Jacobsen was returned to work "as tolerated."

On January 7, 2015, Jacobsen received a formal letter of reprimand from the principal, defendant Dilliplane, admonishing him for multiple infractions that occurred on January 5, 2015, including a confrontation with one of his students. The letter noted that he was currently on progressive discipline and advised that he would be suspended without pay for five nonconsecutive days on January 12, 14, 16, 21, and 22, 2015.

On January 15, 2015, Jacobsen used a firearm to commit suicide at a rental unit he and his wife owned. A suicide note was later found in

a backpack in his truck, which stated:

> Lin,
>
> I'm sorry to leave you this way[.] I'm failing at my job[.] My back is starting to hurt again, and the other knee is starting to be painful. I just can't take the combination of failing health (my fault) and failing at work (again my fault). I have always loved you. You are the best woman for me. I just dug myself a hole that I can't get out of.
>
> Tell [my daughter] that I love her and am proud of her. I am proud of all your kids and think they will be great people . . . .
>
> Love[,] Eric

(Doc. 22-3, at 16 ("EOEJ000281")).

## II.  LEGAL STANDARD

Under Rule 56 of the Federal Rules of Civil Procedure, summary judgment should be granted only if "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A fact is "material" only if it might affect the outcome of the case. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). A dispute of material fact is "genuine" only if the evidence "is such that a reasonable jury could return a verdict for the non-moving party." *Anderson*, 477 U.S. at 248. In deciding a summary judgment motion, all inferences "should be drawn in the light most favorable to

the non-moving party, and where the non-moving party's evidence contradicts the movant's, then the non-movant's must be taken as true." *Pastore v. Bell Tel. Co. of Pa.*, 24 F.3d 508, 512 (3d Cir. 1994).

The party seeking summary judgment "bears the initial responsibility of informing the district court of the basis for its motion," and demonstrating the absence of a genuine dispute of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). If the movant makes such a showing, the non-movant must set forth specific facts, supported by the record, demonstrating that "the evidence presents a sufficient disagreement to require submission to the jury." *Anderson*, 477 U.S. at 251–52.

In evaluating a motion for summary judgment, the Court must first determine if the moving party has made a *prima facie* showing that it is entitled to summary judgment. *See* Fed. R. Civ. P. 56(a); *Celotex*, 477 U.S. at 331. Only once that *prima facie* showing has been made does the burden shift to the nonmoving party to demonstrate the existence of a genuine dispute of material fact. *See* Fed. R. Civ. P. 56(a); *Celotex*, 477 U.S. at 331.

Both parties may cite to "particular parts of materials in the

record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations (including those made for the purposes of the motion only), admissions, interrogatory answers or other materials." Fed. R. Civ. P. 56(c)(1)(A). "An affidavit or declaration used to support or oppose a motion must be made on personal knowledge, set out facts that would be admissible in evidence, and show that the affiant or declarant is competent to testify on the matters stated." Fed. R. Civ. P. 56(c)(4). "Although evidence may be considered in a *form* which is inadmissible at trial, the *content* of the evidence must be capable of admission at trial." *Bender v. Norfolk S. Corp.*, 994 F. Supp. 2d 593, 599 (M.D. Pa. 2014); *see also Pamintuan v. Nanticoke Mem'l Hosp.*, 192 F.3d 378, 387 n.13 (3d Cir. 1999) (noting that it is not proper, on summary judgment, to consider evidence that is not admissible at trial).

## III.  DISCUSSION

The plaintiff has asserted claims of retaliation and discrimination under the ADA. The defendants have moved for summary judgment on several alternative grounds. With respect to the discrimination claim, they argue: (1) Jacobsen was not a disabled person under the ADA; (2)

the Estate has failed to produce evidence of an adverse employment action caused by Jacobsen's disability; and (3) the District had legitimate, nondiscriminatory reasons for any adverse employment actions. With respect to the retaliation claim, they argue: (1) the Estate has failed to produce evidence of a protected activity—that is, there is no evidence Jacobsen requested a reasonable accommodation; (2) the Estate has failed to produce evidence of a causal link between a protected activity and any adverse employment actions; (3) the District had legitimate, nondiscriminatory reasons for any adverse employment actions; and (4) as a matter of law, compensatory damages are not available for ADA retaliation claims.

### A. Discrimination Claims Under the ADA

Under the ADA, an employer is prohibited from discrimination "against a qualified individual on the basis of disability in regard to job application procedures, the hiring, advancement, or discharge of employees, employee compensation, job training, and other terms, conditions, and privileges of employment." 42 U.S.C. § 12112(a). A "qualified individual" is defined by the ADA as a person "who, with or without reasonable accommodation, can perform the essential functions

of the employment position that such individual holds or desires." *Id.*

§ 12111(8). A "disability" is defined as: "(A) a physical or mental impairment that substantially limits one or more major life activities of such individual; (B) a record of such an impairment; or (C) being regarded as having such an impairment . . . ."[3] *Id.* § 12102(1). The ADA provides a list of what constitutes "major life activities," which includes, but are not limited to: "caring for oneself, performing manual tasks, seeing, hearing, eating, sleeping, walking, standing, lifting, bending, speaking, breathing, learning, reading, concentrating, thinking, communicating, and working." *Id.* § 12102(2)(A). "Discrimination under the ADA encompasses not only adverse actions motivated by prejudice and fear of disabilities, but also includes failing to make reasonable

---

[3] A person is regarded as disabled under subsection (C) when "the employer either 'mistakenly believed that the employee has a physical [or mental] impairment that substantially limits one or more major life activities' or 'mistakenly believed that an actual non-limiting impairment substantially limits one or more major life activities.'" *Sulima v. Tobyhanna Army Depot*, 602 F.3d 177, 188 (3d Cir. 2010) (brackets omitted); *see also* 42 U.S.C. § 12102(3)(A). Moreover, the "regarded as" definition expressly excludes impairments that are transitory (*i.e.*, with an actual or expected duration of six months or less) and minor. *Id.* § 12102(3)(B); *see, e.g.*, *Budhun v. Reading Hosp. & Med. Ctr.*, 765 F.3d 245, 259–60 (3d Cir. 2014) (broken bone in hand was a transitory and minor impairment not protected under § 12102(1)(C)).

accommodations for a plaintiff's disabilities." *Taylor v. Phoenixville Sch. Dist.*, 184 F.3d 296, 306 (3d Cir. 1999); *see also* 42 U.S.C. § 12112(b)(5)(A).

Where a plaintiff relies upon circumstantial evidence to support a disability discrimination claim, our analysis is governed by the three-step burden-shifting framework of *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802–04 (1973). *Shaner v. Synthes*, 204 F.3d 494, 500 (3d Cir. 2000).

> Briefly summarized, the *McDonnell Douglas* analysis proceeds in three stages. First, the plaintiff must establish a prima facie case of discrimination. If the plaintiff succeeds in establishing a prima facie case, the burden shifts to the defendant "to articulate some legitimate, nondiscriminatory reason for the employee's rejection." Finally, should the defendant carry this burden, the plaintiff then must have an opportunity to prove by a preponderance of the evidence that the legitimate reasons offered by the defendant were not its true reasons, but were a pretext for discrimination. While the burden of production may shift, "[t]he ultimate burden of persuading the trier of fact that the defendant intentionally discriminated against the plaintiff remains at all times with the plaintiff." Our experience is that most cases turn on the third stage, i.e., can the plaintiff establish pretext.

*Jones v. Sch. Dist. of Philadelphia*, 198 F.3d 403, 410 (3d Cir. 1999) (citations omitted).

At the first step,

> to establish a prima facie case of discrimination under
> the ADA, the plaintiff must show: "(1) he is a disabled
> person within the meaning of the ADA; (2) he is
> otherwise qualified to perform the essential functions
> of the job, with or without reasonable accommodations
> by the employer; and (3) he has suffered an otherwise
> adverse employment decision as a result of
> discrimination."

*Taylor*, 184 F.3d at 306 (quoting *Gaul v. Lucent Techs.*, 134 F.3d 576, 580 (3d Cir. 1998)).

Should the plaintiff establish his prima facie case at step one, in step two

> the burden of production shifts to the employer to
> "proffer a legitimate, non-discriminatory reason for the
> adverse employment decision." An employer need only
> introduce "evidence which, taken as true, would permit
> the conclusion that there was a nondiscriminatory
> reason for the unfavorable employment decision." "The
> employer need not prove that the tendered reason
> actually motivated its behavior, as throughout this
> burden-shifting paradigm the ultimate burden of
> proving intentional discrimination always rests with
> the plaintiff."

*Wilkie v. Luzerne Cty.*, 207 F. Supp. 3d 433, 437 (M.D. Pa. 2016) (quoting *Abramson v. William Patterson Coll.*, 260 F.3d 265, 281–82 (3d Cir. 2001), and *Fuentes v. Perskie*, 32 F.3d 759, 763 (3d Cir. 1994)).

Finally, if the employer meets its burden of production at step

two, in step three

> the burden of production shifts back to the plaintiff to establish that a jury "could reasonably either (1) disbelieve the employer's articulated legitimate reasons; or (2) believe that an invidious discriminatory reason was more likely than not a motivating factor or determinative cause of the employer's action."

*Id.* (quoting *Fuentes*, 32 F.3d at 764).

Here, the defendants contend that the Estate has failed to establish a prima facie case because it has failed to show that (a) Jacobsen was a disabled person within the meaning of the ADA, or (b) he suffered an otherwise adverse employment decision as a result of discrimination. The defendants appear to concede that Jacobsen was qualified to perform the essential functions of the job of math teacher.

"It is insufficient for individuals attempting to prove disability . . . to merely submit evidence of a medical diagnosis of an impairment." *Toyota Motor Mfg. v. Williams*, 534 U.S. 184, 198 (2002), *overruled on other grounds by* ADA Amendments Act of 2008, Pub. L. 110-325, 122 Stat. 353 (2008); *Colwell v. Rite Aid Corp.*, 602 F.3d 495, 501–02 (3d Cir. 2010) (quoting *Toyota*). But rather, a plaintiff must "prove a disability by offering evidence that the extent of the limitation caused by their impairment in terms of their own experience is substantial."

*Toyota*, 534 U.S. at 198 (quoting *Albertson's, Inc. v. Kirkingburg*, 527 U.S. 555, 567 (1999)) (alterations omitted); *Colwell*, 602 F.3d at 502 (quoting *Toyota*).

With respect to whether the decedent was disabled, the parties have focused their arguments on the scope or severity of his physical limitations. In its brief in opposition, the Estate recites the decedent's various diagnoses, symptoms, and functional limitations, suggesting that they *ipso facto* constituted substantial limits on Jacobsen's major life activities of walking, sitting, standing, navigating stairs, lifting, twisting, turning, sleeping, and engaging in unspecified activities of daily living. Under case law, courts have found that individuals with back pain, difficulty walking, and lifting restrictions[4] similar to Jacobsen's were not substantially limited in a major life activity. *See, e.g.*, *Helfter v. United Parcel Serv., Inc.*, 115 F.3d 613, 617 (8th Cir. 1997); *Hodson v. Alpine Manor, Inc.*, 512 F. Supp. 2d 373, 389–90 (W.D. Pa. 2007). The Third Circuit has similarly rejected moderate difficulty in walking or climbing stairs as a substantial limitation on a major life

---

[4] Upon his return, post-surgery, Jacobsen was limited to lifting a maximum of 20 pounds, or 10 pounds frequently.

activity. *Kelly v. Drexel Univ.*, 94 F.3d 102, 107–08 (3d Cir. 1996). But injuries "that temporarily prevent[] an employee from working may qualify as a disability." *Dykstra v. Florida Foreclosure Attorneys, PLLC*, 183 F. Supp. 3d 1222, 1230–31 (S.D. Fla. 2016). The evidence establishes the decedent's extended absence from work due to back, hip, and knee injuries on two occasions: one period from January 23, 2012, to April 2, 2012; and a second period from early June 2013 through February 10, 2014. Viewed in the light most favorable to the non-moving plaintiff, this is sufficient to demonstrate the existence of a genuine dispute of material fact with respect to whether the decedent was a disabled person under the ADA.

With respect to an adverse employment action, the Estate has disclaimed any contention that the series of negative performance reviews and disciplinary suspensions were imposed because of Jacobsen's disability. Instead, the Estate contends that the discriminatory adverse employment actions were: (1) defendant Dilliplane's decision to move him from his larger third-floor classroom, which had its own bathroom and adequate storage space, to a smaller classroom on the second floor, which was 100 feet from the nearest

restroom and lacked adequate storage space, requiring more than 20 boxes of his teaching materials to be relocated to a loading dock far from his classroom; and (2) defendant Dilliplane's "obstruction" of his requests to transfer to an ISS position at one of the two high schools within the district.

Generally, an adverse employment action is one that is "serious and tangible enough to alter an employee's compensation, terms, conditions, or privileges of employment." *Cardenas v. Massey*, 269 F.3d 251, 263 (3d Cir. 2001). As the Third Circuit has recognized, a change in reporting relationships—such as Jacobsen's reassignment to a new "team"—is generally insufficient to constitute an adverse employment action. *See Langley v. Merck & Co., Inc.*, 186 Fed. App'x 258, 160 (3d Cir. 2006). Similarly, making a teacher move from one functional classroom to another is generally not an adverse employment action. *See Yarnall v. Philadelphia Sch. Dist.*, 57 F. Supp. 3d 410, 422 (E.D. Pa. 2014). A change of office (or classroom) may only constitute an adverse employment action if the move results in the employee's inability to perform his or her work. *See Khalil v. Rohm and Haas Co.*, Civil Action No. 05-3396, 2008 WL 383322, at *17–*18 (E.D. Pa. Feb. 11, 2008).

Although a significant volume of Jacobsen's excess instructional or personal materials was relocated to the school's loading dock when he was moved from a third-floor classroom to a second-floor one, there is no evidence in the record to suggest that this actually interfered in any way with his ability to perform his work. Nor is there any evidence that the new classroom itself or its particular location did so. "While generalized allegations of injury may suffice at the pleading stage, a plaintiff can no longer rest on such 'mere allegations' in response to a summary judgment motion, but must set forth 'specific facts' by affidavit or other evidence." *Pennsylvania Prison Soc'y v. Cortes*, 508 F.3d 156, 161 (3d Cir. 2007).

With respect to Dilliplane's purported "obstruction" of Jacobsen's application for two ISS positions, the Estate has likewise failed to adduce any evidence that Dilliplane, principal of Lehman Intermediate School, played any role in the hiring process for the vacant teaching positions at two *other* schools, or that he took any action to "obstruct" Jacobsen from being selected for these positions. Mere "speculation and conjecture may not defeat a motion for summary judgment." *Acumed LLC v. Adv. Surgical Servs., Inc.*, 561 F.3d 199, 228 (3d Cir. 2009).

We further note that there is no evidence in the record before us that—other than requesting medical leave to permit him time for surgical treatment and recovery, which he received—Jacobsen ever requested an accommodation for any disability. The Estate argues that the defendants knew of his impairments and thus should not have moved him to a smaller classroom. But while they may have had notice of his disability, there is no evidence of any request for an accommodation with respect to classroom size or configuration, or its proximity to a bathroom. "The ADA requires that employers and employees engage in an interactive process to identify the employee's limitations resulting from a disability and the kinds of accommodation which would be both appropriate and feasible." *Hodson*, 512 F. Supp. 2d at 392; *see also* 29 C.F.R. § 1630.2(*o*)(3). But it is "[t]he employee [who] bears the responsibility of initiating the interactive process by providing notice of her disability and requesting accommodation for it." *Hodson*, 512 F. Supp. 2d at 392 (citing *Taylor*, 184 F.3d at 313). The ADA does not require an employer to guess at actions it should take to provide reasonable accommodation to an employee. *Geuss v. Pfizer, Inc.*, 971 F. Supp. 164, 173 & n.13 (E.D. Pa. 1996).

Similarly, there is no evidence in the record to indicate that Jacobsen's two applications for ISS teacher positions at the District's two high schools were ever framed as requests for accommodation. Jacobsen's correspondence merely expressed his interest in the positions, without reference to his disability or any manner in which either of these positions would serve as an accommodation.

Finally, we note the timing of the classroom move does not support a reasonable inference of causation. Jacobsen's classroom reassignment was determined shortly before the end of the 2012–2013 school year, prior to his extended leave of absence for surgery on his back and hip,[5] and implemented over the summer break. His return from a previous medical leave of absence was more than a year earlier, and there is no objective medical evidence concerning any functional limitations prior to his July 2013 surgery.

Viewing the evidentiary record and all reasonable inferences therefrom in the light most favorable to the non-movants, the Estate has failed to demonstrate the existence of a genuine dispute of material

---

[5] We note that, while the specific date of this determination is not clear from the record, Jacobsen indicated in email correspondence that he packed his classroom materials himself before his medical leave.

fact with respect to whether Jacobsen suffered an otherwise adverse employment decision as a result of discrimination. Accordingly, the plaintiff having failed to establish a prima facie case of discrimination under the ADA, summary judgment will be granted to the defendants with respect to the Estate's discrimination claims.

### B. Retaliation Claims Under the ADA

The ADA provides: "No person shall discriminate against any individual because such individual has opposed any act or practice made unlawful by this chapter or because such individual made a charge . . . under this chapter." 42 U.S.C. § 12203(a). "To establish a prima facie case of retaliation under the ADA, a plaintiff must show: (1) protected employee activity; (2) adverse action by the employer either after or contemporaneous with the employee's protected activity; and (3) a causal connection between the employee's protected activity and the employer's adverse action." *Krouse v. Am. Sterilizer Co.*, 126 F.3d 494, 500 (3d Cir. 1997). To prevail on an ADA retaliation claim, a plaintiff does not need to establish that he is disabled within the meaning of the ADA, but only that he requested an accommodation under the ADA. *Williams v. Philadelphia Hous. Auth. Police Dep't*, 380 F.3d 751, 759 n.2

(3d Cir. 2004). As with ADA discrimination claims, ADA retaliation claims are analyzed under the *McDonnell Douglas* burden-shifting framework. *Larkin v. Methacton Sch. Dist.*, 773 F. Supp. 2d 508, 529 (E.D. Pa. 2011).

The defendants contend that the Estate has failed to articulate a protected activity. The amended complaint alleges that Jacobsen was retaliated against for requesting reasonable accommodations. The defendants argue that the Estate has adduced no evidence of any request for accommodation at all.

In response, the Estate has identified Jacobsen's 2013 request for medical leave and his 2013 and 2014 applications for ISS teacher positions at the District's two high schools constitute requests for accommodation. As previously noted, there is no evidence in the record to indicate that Jacobsen's two applications for ISS teacher positions at the District's two high schools were ever framed as requests for accommodation. Jacobsen's correspondence merely expressed his interest in the positions, without reference to his disability or any manner in which either of these positions would serve as an accommodation.

The request for medical leave, on the other hand, was indeed a request for accommodation—one which was granted. Jacobsen requested a medical leave of absence of extended duration to permit him time for surgical treatment of his back and hip and recovery from those surgeries. He requested on multiple occasions that his medical leave be extended until he was medically cleared to return to work. In each instance, medical leave was granted, without incident.

In its brief in opposition to summary judgment, the Estate has articulated no adverse employment actions that it contends were done in retaliation for Jacobsen's request for medical leave. It has disclaimed any reliance upon the series of negative performance reviews and disciplinary suspensions imposed upon Jacobsen, which began long before and continued long after any requests for medical leave documented in the record before us. That leaves the change of Jacobsen's classroom and team assignments and the District's failure to select him for either ISS teacher position to which he applied. As previously noted, the Estate has failed to adduce any evidence that this conduct constituted adverse employment action.

Moreover, as the defendants have aptly noted, compensatory and

punitive damages are not recoverable on an ADA retaliation claim. *Keating v. Pittston City Hous. Auth.*, No. 3:17-CV-465, 2018 WL 1414459, at *6–*7 (M.D. Pa. Mar. 21, 2018); *Wilkie v. Luzerne Cty.*, No. 3:14cv462, 2014 WL 4977418, at *4 (M.D. Pa. Oct. 6, 2014); *Baker v. PPL Corp.*, Civil Action No. 1:09-CV-0428, 2010 WL 419417, at *4–*8 (M.D. Pa. Jan. 29, 2010). "The ADA's remedial structure allows for an aggrieved individual to obtain only equitable relief, such as reinstatement and back pay." *Wilkie*, 2014 WL 4977418, at *4. Thus back pay is the only possible remedy available in this case,[6] and back pay is appropriate only where the retaliatory conduct has "some concrete effect on the plaintiff's employment status, such as a denied promotion, a differential in compensation, or termination." *Hare v. Potter*, 549 F. Supp. 2d 688, 692 (E.D. Pa. 2007) (quoting *Landgraf v. USI Film Prods.*, 511 U.S. 244, 254 (1994)); *see also Spencer v. Wal-Mart Stores*, 469 F.3d 311, 315–17 & nn.4–6 (3d Cir. 2006) (holding equitable remedy of back pay not available where there is no loss of pay due to actual or constructive discharge). There is no evidence in the

---

[6] We don't mean to be insensitive, but reinstatement—or front pay in lieu of reinstatement—is clearly unavailable. *See E.E.O.C. v. Timeless Inv., Inc.*, 734 F. Supp. 1035, 1072 & n.49 (E.D. Cal. 2010).

record before us to suggest that Jacobsen's compensation was affected by his classroom and team reassignment, the Estate has failed to adduce evidence with respect to any pay differential between the math teacher position Jacobsen held and the ISS teacher positions for which he applied, and the Estate has neither pleaded nor adduced evidence in support of a claim that Jacobsen was constructively discharged.

Viewing the evidentiary record and all reasonable inferences therefrom in the light most favorable to the non-movants, the Estate has failed to demonstrate the existence of a genuine dispute of material fact with respect to the existence of any adverse employment action. Accordingly, because the plaintiff has failed to establish a prima facie case of retaliation under the ADA, and because the ADA affords no remedies for retaliation under the facts of this case, summary judgment will be granted to the defendants with respect to the Estate's retaliation claims.

### C. PHRA Claims

The parties have not addressed the Estate's claims under the PHRA separately, and neither do we. The Estate's PHRA claims in Counts III and IV are coextensive with its claims under the ADA. *See*

*Kelly*, 94 F.3d at 105; *Wilkie*, 207 F. Supp. 3d at 436 n.5.

## IV.   CONCLUSION

For the foregoing reasons, summary judgment will be granted in favor of the defendants with respect to all of the plaintiff's claims.

An appropriate Order follows.

Dated: September 26, 2018       ***s/ Joseph F. Saporito, Jr.***
                                JOSEPH F. SAPORITO, JR.
                                United States Magistrate Judge